UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAFONDA CUNNINGHAM,

                Plaintiff,

      v.

RAMJAY INC.,
  SHASTHRA USA INC.,

                Defendants.

Civil Action No. 22-931(BAH)

Judge Beryl A. Howell

**MEMORANDUM OPINION**

Plaintiff Lafonda Cunningham filed this action against defendants Ramjay, Inc. ("Ramjay") and Shasthra USA Inc. ("Shasthra"), alleging that she was subject to a hostile work environment and retaliation based on her sex, in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* Second Am. Compl. ¶¶ 25–30, ECF No. 35. Defendants have moved for summary judgment. *See* Defs.' Mot. Summ. J., ECF No. 27; Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), ECF No. 28; Pl.'s Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 29; Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 30. For the reasons set forth below, defendants' motion is GRANTED.

**I.    BACKGROUND**

The factual background and procedural history of the instant matter are summarized below.[1]

---

[1] Certain names and citations require clarification at the outset. First, while plaintiff refers to Mathew McMullen interchangeably as "Mathew McMullen" and "Mathew Mullen," he will be referred to herein as "McMullen," which appears to be his correct surname. *See, e.g.*, Defs.' Mem., Ex. 4 at 5–6 ("Shasthra Interrogs. & Producs."), ECF No. 28-4; Pl.'s Opp'n at 2 n.1.

Second, both parties include their statement of material facts in their summary judgment briefing, rather than as a standalone exhibit. *See* Defs.' Mem. at 2–4; Pl.'s Opp'n at 1–8. Citations to the parties' statements of material facts will thus be to their briefing.

1

### A.   Factual Background

Defendant Ramjay, which has its principal place of business in Virginia, is a transportation company providing transportation and security services to the Washington D.C. metro area. Second Am. Compl. ¶¶ 2, 7. Ramjay provides its security services, including for residential and commercial properties, events and venues, and personal protection, through Shasthra, which also has its principal place of business in Virginia. *Id.* ¶¶ 3, 7; Defs.' Mem., Ex. 1 ("Cunningham Dep.") at 12:20–14:20, ECF No. 28-1. Ramjay and Shasthra have the same owner, though their precise corporate relationship, if any, remains unclear. Defs.' Mem. at 1.[2]

In September 2021, plaintiff, a female Maryland resident, was hired as a security officer and assigned to the Blackbird Apartments in Washington, D.C., where she reported to Terrell Farmer, Aisha Tunstall, and Mathew McMullen. *See* Defs.' Mem. at 2; Pl.'s Opp'n at 1–2; *see also* Cunningham Dep. at 12:11–19, 15:13–22; Defs.' Mem., Ex. 4 ("Shasthra Interrogs. & Producs.") at 1, 3–4, ECF No. 28-4; Second Am. Compl. ¶¶ 1, 9–11.[3] In her role as a security officer, she patrolled the residential apartment complex, made reports, followed up on leads about what was happening in the building, and presented a "command presence" for the

---

Third and finally, plaintiff filed, with her opposition, six exhibits: the deposition transcripts for plaintiff (Exhibit 1), McMullen (Exhibit 2), and Farmer (Exhibit 3); a declaration signed by plaintiff (Exhibit 4); and an email (Exhibit 5) and text message exchange (Exhibit 6) between plaintiff and McMullen. *See* Pl.'s Opp'n, Ex. at 1–26 (Ex. 1), 27–47 (Ex. 2), 48–64 (Ex. 3), 65–68 (Ex. 4), 69–72 (Ex. 5), 73–74 (Ex. 6), ECF No. 29-1. Defendants also filed identical copies of the deposition transcripts for plaintiff, McMullen, and Farmer. *See* Defs.' Mem., Ex. 1 ("Cunningham Dep."), ECF No. 28-1; Defs.' Mem., Ex. 2 ("Farmer Dep."), ECF No. 28-2; Defs.' Mem., Ex. 3 ("McMullen Dep."), ECF No. 28-3. For ease of reference, citations to the transcripts will be to defendants' copies, which are filed as standalone exhibits rather than, as plaintiff's exhibits, combined into one document with continuous pagination. *See* Standing Order ¶ 5(c) ("Each attachment to a filing (e.g., . . . each exhibit . . . ) must be filed as a separate PDF . . . .").

[2]   *See* Second Am. Compl. ¶ 8 ("Shasthra is an entity or affiliate of Ramjay."); Farmer Dep. at 8:3–7 (explaining that Ramjay and Shasthra are "all one and the same"); McMullen Dep. at 14:5–18:21 (explaining that Ramjay and Shasthra are part of the same larger company), 68:4–8 (explaining that Ramjay is "the primary company that, generally, controls everything"); Cunningham Dep. at 29:16–31:18 (reflecting lack of clarity regarding relationship); *see also* Min. Order (Nov. 11, 2022) (recognizing uncertainty).

[3]   Shasthra had a contract to provide security services at the Blackbird Apartments. *See* Cunningham Dep. at 24:13–17.

property.  *See* Pl.'s Opp'n at 2; Cunningham Dep. at 15:4–12; Shasthra Interrogs. & Producs. at 3.

Plaintiff alleges that she was sexually harassed by Farmer from September to October 2021.  Specifically, she alleges that, on September 27, 2021, plaintiff's first day of work, Farmer pressed the front side of his body onto plaintiff's vehicle, made a sexualized gesture, and asked plaintiff for a hug.  *See* Defs.' Mem. at 2; Pl.'s Opp'n at 1, 3; Cunningham Dep. at 32:1–37:12, 43:13–44:16; Defs.' Mem., Ex. 2 ("Farmer Dep.") at 34:3–36:21, ECF No. 28-2.  Plaintiff took several short videos of the interaction and sent them to her boyfriend at the time, remarking that her supervisor was "unprofessional" and made her feel "uncomfortable."  Cunningham Dep. at 39:1–9, 40:14–41:14, 42:21–47:8.

Then, between September and October 2021, Farmer allegedly made a comment about plaintiff's breasts, telling her to "get [her] titty" off him, and asked her if she was gay.  Pl.'s Opp'n, Ex. 4 ("Cunningham Decl.") ¶ 3, ECF No. 29-1; *see also* Farmer Dep. at 29:9–30:11 (recalling his statements as: "Excuse me.  Back up.  You have your breasts on me. . . .  You don't need to be that close").  On October 9, 2021, Farmer told plaintiff that he had a "dirty mind."  Cunningham Decl. ¶ 4; *see also* Farmer Dep. at 49:21–50:20 (acknowledging similar statements, but positing that he was not speaking to plaintiff).

On October 20, 2021, Farmer said to plaintiff "don't act like you ain't miss me," which plaintiff found "unnecessary," "unprofessional," and to "creat[e] an unfavorable and . . . start of a hostile work environment."  Cunningham Dep. at 59:1–18; Defs.' Mem. at 2; Pl.'s Opp'n at 1, 3; *see also* Farmer Dep. at 38:11–17.  On October 21, 2021, Farmer called plaintiff in the early morning.  Plaintiff did not pick up the phone and thought the call was "unnecessary," "unprofessional," and "unwarranted" because she was "not at work" in the "early hours of the

3

morning." Cunningham Dep. at 61:2–21; Defs.' Mem. at 2; Pl.'s Opp'n at 1, 3; *see also* Farmer Dep. at 25:10–26:21 (contending that he called her to tell her about an "open post").

On October 23, 2021, Farmer allegedly forced plaintiff to pull down her mask so that he could see her face. Plaintiff repeatedly refused, but when Farmer threatened to pull her "off the schedule," she relented. Cunningham Dep. at 61:22– 63:4; Defs.' Mem. at 2; Pl.'s Opp'n at 1, 4. When plaintiff revealed her face, Farmer called plaintiff "cute," his "type," and "thick." Cunningham Decl. ¶¶ 7–8. *But see* Farmer Dep. at 48:17–19 (denying allegations). When plaintiff refused his advances, Farmer allegedly said "don't be surprised when you off the schedule." *See* Defs.' Mem. at 2; Pl.'s Opp'n at 1–2.

Plaintiff alleges that she first reported Farmer's conduct to Tunstall on October 25, 2021, then again on October 31, 2021. *See* Pl.'s Opp'n at 4; *see also* Second Am. Compl. ¶ 20. Tunstall, in response, told plaintiff to speak to McMullen because Farmer outranked her. *See* Cunningham Dep. at 63:14–65:3 (explaining that Tunstall said that "Farmer was over top of her" and thus plaintiff had to "talk to the chief").

On November 6, 2021, plaintiff attended an in-person meeting with McMullen, Tunstall, and two other supervisors to discuss her allegations against Farmer and her feelings that Farmer was making her "work environment hostile," even after only "2 months" of work. Second Am. Compl. ¶¶ 22–23; *see* Defs.' Mem. at 3; Pl.'s Opp'n at 2; Cunningham Dep. at 65:17–66:5.[4] Plaintiff followed up, on the same day, with an email to McMullen delineating her allegations. *See* Cunningham Dep. at 66:8–67:17; Pl.'s Opp'n, Ex. 5, ECF No. 29-1. McMullen, in response,

---

[4] Plaintiff alleges that this meeting occurred on November 5, 2021, *see* Pl.'s Opp'n at 5, but the follow-up email sent by plaintiff after this meeting, which plaintiff attaches as an exhibit to her opposition, makes clear that the meeting occurred on November 6, 2021, *see* Pl.'s Opp'n, Ex. 5, ECF No. 29-1 (explaining, in an email dated November 6, 2021, that "[t]he following is the requested reports of past events discussed in the meeting this morning").

instructed plaintiff to report to Tunstall instead of Farmer, and opened an investigation into Farmer on the same day.  Cunningham Dep. at 70:3–22.[5]

While the investigation was pending, plaintiff had "limited contact" with Farmer and "was reporting to Tunstall for very much everything." *Id.* at 72:10–13.  When asked whether Farmer did anything "unprofessional" to her "while the investigation was going on," Cunningham answered: "Not that I can readily recall, no." *Id.* at 72:17–20.  She explained that the "damage was already done," and that it didn't "matter if he did anything more" since she was "already scared" and "already worried about [her] job." *Id.* at 73:21–74:8.

In late November or early December, while the investigation into Farmer was still ongoing, plaintiff tested positive for COVID and was instructed by Tunstall to quarantine for 14 days before "coming back to regular scheduled programming . . . , back to the shift that [she] had been working." *Id.* at 76:9–77:19.  When plaintiff called to "report to duty," Tunstall allegedly told plaintiff "to be on standby" for further instruction from the "chief."  Neither Tunstall nor the chief "reached back out to [plaintiff] at any period after that," and "the chief . . . kept giving excuses on why [she] wasn't working" and "why [she] couldn't go back to work," though plaintiff, when asked, could not remember examples of the excuses offered. *Id.* at 78:1–22.

---

[5]     The investigation revealed that two other female employees "may have experienced" harassment by Farmer: one alleged "inappropriate touching," and the other alleged "a suggestion of a possible sexual advance." McMullen Dep. at 7:20–9:21.  The investigation found that "inappropriate contact was more likely than not," leading to Farmer's termination. *Id.* at 24:1–6.  Plaintiff does not raise the other two female employees' allegations as part of her hostile work environment claim.

Approximately two months later, after the investigation was complete, Farmer was allegedly rehired.  *See* Farmer Dep. at 18:1–8; Pl.'s Opp'n at 6.  Farmer stated that he returned to his role as a "lieutenant" and that plaintiff worked below him in the organizational structure.  *See* Farmer Dep. at 18:1–8.  Farmer's retelling is inconsistent with documentary evidence demonstrating that plaintiff was terminated before Farmer was rehired and plaintiff's testimony suggesting the same.  *See* Pl.'s Opp'n, Ex. 6 at 74, ECF No. 29-1 (showing text from plaintiff to McMullen stating: "I've also been made aware recently that [F]armer was never fired and has returned to dc sites in my absence as[ ]well."); Shasthra Interrogs. & Producs. at 1–2, 6.  In any case, neither Farmer nor plaintiff recall interacting after the investigation into Farmer began, and plaintiff makes no allegations about Farmer's conduct after November 6, 2021.  *See* Farmer Dep. at 44:14–21; Cunningham Dep. at 72:6–20.

Plaintiff never received a formal termination letter and was simply not "given work," which she alleges effectively constituted her termination. *Id.* at 81:22–82:5. Defendants contend that plaintiff was terminated because their contract with the Blackbird Apartments had ended, and plaintiff was hired for the Blackbird Apartments contract. *See* Defs.' Mem. at 4; Shasthra Interrogs. & Producs. at 2; McMullen Dep. at 48:4–7; *see also* Cunningham Dep. at 79:1–6 (stating that she "guess [she] did hear that" defendants "lost the contract at Blackbird"). Plaintiff was formally terminated on December 24, 2021. Shasthra Interrogs. & Producs. at 1; *see* Second Am. Compl. ¶ 24.

### B. Procedural Background

Plaintiff filed, on April 5, 2022, the complaint initiating this action against Ramjay, alleging one count each of hostile work environment and retaliation under DCHRA. *See generally* Compl., ECF No. 1. Plaintiff moved, on October 12, 2022, to join Shasthra as a defendant and to file an amended complaint, which motion was granted over Ramjay's objections. *See* Min. Order (Nov. 11, 2022). Plaintiff filed, on November 14, 2022, her first amended complaint, which differed from her case-initiating complaint only insofar as Shasthra was added as an additional defendant and slightly modified factual allegations were included to explain the relationship between Ramjay and Shasthra. *See generally* First Am. Compl., ECF No. 17. After the parties requested and were granted over seven months of discovery, defendants moved for summary judgment.

On September 21, 2023, the Court directed plaintiff to show cause why the first amended complaint, which alleges neither a federal cause of action nor an amount in controversy, should not be dismissed for lack of subject matter jurisdiction. *See* Min. Order (Sept. 21, 2023); *see also Bronner on Behalf of Am. Studies Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020)

(explaining that questions of subject matter jurisdiction "must be policed by the courts on their own initiative" and that "the party claiming subject matter jurisdiction . . . has the burden to demonstrate that it exists" (citation omitted)).  Plaintiff moved for leave to file a second amended complaint, which was identical to her first amended complaint but with the addition of an allegation that the amount in controversy exceeds $75,000.  *See* Pl.'s Mot. for Leave to File Second Am. Compl., ECF No. 33.  Plaintiff's motion was granted over defendants' objection.  *See* Min. Order (Nov. 2, 2023).  At the Court's direction, the parties filed, on November 16, 2023, a joint status report, informing the Court that no supplementation was necessary to defendants' pending motion for summary judgment and the related legal memoranda in support and in opposition.  *See* Joint Status Report, ECF No. 37.[6]  Defendants' motion is now ripe for consideration.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable

---

[6]     On December 7, 2023, plaintiff filed a notice of supplemental authority to draw attention to the Human Rights Enhancement Act of 2022, D.C. Law 24-172, which was passed by the Council of the District of Columbia on July 25, 2022.  *See* Pl.'s Supp. Memo., ECF No. 38; Pl.'s Supp. Memo., Ex. 1, ECF No. 38-1.

7

reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (citation omitted)); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (citation omitted)); Fed. R. Civ. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015).

In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *Equal Rts. Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (citation omitted); Fed. R. Civ. P. 56(e). If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the

8

facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is required to consider only the materials explicitly cited by the parties but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

The DCHRA prohibits employers from "discharg[ing]" or otherwise "discriminat[ing] against any individual, with respect to his or her compensation, terms, conditions, or privileges of employment . . . in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee" "wholly or partially for a discriminatory reason based upon the actual or perceived" sex of that employee. D.C. Code § 2-1402.11(a)(1)(A). Discrimination claims under DCHRA are analyzed "the same way" as those brought under the federal anti-discrimination laws. *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011); *see also Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887–88 (D.C. 2003).

### A. Hostile Work Environment

To state a claim of hostile work environment under the DCHRA, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on membership in a protected class; and (4) the harassment was "severe and pervasive enough to affect a term, condition, or privilege of employment." *Lively*, 830 A.2d at 888 (citation omitted); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) ("To prevail on [a hostile work environment] claim, a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))). "Under this standard, a plaintiff must demonstrate both an objectively hostile or abusive environment, *i.e.*, one that a reasonable person would find hostile or abusive, and a subjective perception by the plaintiff that the environment is abusive." *Lively*, 830 A.2d at 889 (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998)).

To determine whether a work environment is objectively hostile, a court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). "[O]rdinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" and "simple teasing, offhand comments, and isolated incidents (unless extremely serious," do not "amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citations omitted). Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

In advancing her hostile-work-environment claim, plaintiff points to several instances of alleged sexual harassment between September and October 2021: Farmer (1) pressing the side of his body onto plaintiff's vehicle; (2) telling plaintiff to "get her titty" off him; (3) telling plaintiff he has a "dirty mind"; (4) saying to plaintiff "don't act like you ain't miss me"; (5) calling plaintiff by phone in the early morning; and (6) asking plaintiff to remove her mask so that he could see her face, saying that she would be removed from the schedule if she didn't do so, and, when plaintiff complied, calling her his "type," "thick" and "cute." Pl.'s Opp'n at 10–11; *see also* Cunningham Decl. ¶¶ 1–8.

These acts of alleged harassment are unquestionably inappropriate workplace conduct, but inappropriate conduct, without more, is insufficient to establish a hostile work environment claim. In this Circuit, "even multiple instances of physical contact and sexual advances may not be sufficient" to sustain a hostile work environment claim, and "incidents involving verbal comments," unless particularly charged, "must generally be quite pervasive or severe to be actionable." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 77–78 & nn. 18–22 (D.D.C. 2013) (cataloguing cases, and concluding that allegations including colleagues propositioning plaintiff for sex, inviting her to get drunk so that she and a colleague could "have a good time," making crass jokes about oral sex, and engaging in unwanted physical contact did not raise a hostile work environment claim). For this reason, courts have found that similar conduct as plaintiff alleges here, including offensive comments, lewd gestures, and unwanted touching, does not meet the standard of severe or pervasive necessary to establish a hostile work environment claim. *See, e.g.*, *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98–99 (D.D.C. 2007) (cataloguing cases, and concluding that allegations of sexual harassment, including touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on a weekend trip, was not severe or pervasive); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (cataloguing cases, and concluding that allegations that co-worker caressed plaintiff on knee, placed her breast on his arm, and placed her fingers on his buttocks were "not sufficiently severe in quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment"); *Tucker v. Johnson*, 211 F. Supp. 3d 95, 100–01 (D.D.C. 2016) (cataloguing cases, and concluding that allegations that colleague engaged in numerous incidents of inappropriate behavior, including making comments about plaintiff's clothes and perfume, such as that her necklace would "hit right along her breast

11

line," and sneaking up behind her and looking down her shirt, was not actionable). To be sure, the alleged conduct occurred in the span of two months. Even setting aside the fact that defendants attempted to take remedial action, *see Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013), however, Farmer's conduct, as alleged by plaintiff, while unseemly and by no means ideal workplace conduct, amounts to "a few isolated incidents of offensive conduct" and is thus neither so severe nor so pervasive to give rise to an actionable hostile work environment, *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *see also Harris*, 510 U.S. at 21–23. Discrimination laws, the Supreme Court has explained, are not intended to create a "general civility code" in the workplace. *Faragher*, 524 U.S. at 788.

Plaintiff, in addition, has failed to establish that Farmer's conduct affected a "term, condition, or privilege" of her employment. *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002) (citation omitted); *see also Baloch*, 550 F.3d at 1201 (explaining that harassing conduct must "alter the conditions of the victim's employment and create an abusive working environment"). Plaintiff repeatedly testified that Farmer's behavior was "unprofessional," "unwarranted," and "unwelcome" and made her feel "uncomfortable." *See, e.g.*, Cunningham Dep. at 38:18–22, 40:18–22, 41:10–14, 44:4–7, 45:18–46:18, 59:10–18, 61:12–21. In her declaration in support of her opposition, plaintiff states: "Farmers [sic] comments made her feel very uncomfortable during my short tenure with Ramjay." Cunningham Decl. ¶ 9; *see also* Pl.'s Opp'n at 4 ("Cunningham testified that Farmer's comments made her feel uncomfortable."), 10 ("Defendants use of the term 'unprofessional' does not gloss over the fact that Farmer's conduct was 'unwelcome.'").[7] "General feelings of workplace

---

[7] In fact, plaintiff suggested in her deposition that she did not subjectively believe her workplace was hostile until Farmer's comment, on October 20, 2021, stating, "don't act like you ain't miss me." *See* Cunningham Dep. at 59:1–18 (stating that Farmer's comment "creat[ed] an unfavorable and . . . start of a hostile work environment"). If plaintiff is taken at her word, her hostile work environment claim is further weakened.

discomfort or unease—even those resulting from inappropriate workplace conduct of a sexual nature—are simply not enough to support a claim for a hostile work environment." *Tucker*, 211 F. Supp. 3d at 101–02; *see also Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004) ("To overcome summary judgment on [a] hostile work environment claim, [plaintiff] must present evidence from which a reasonable jury could find that [defendant's] conduct towards her was more than merely offensive, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment."). While the interactions between plaintiff and Farmer may have reasonably made plaintiff uncomfortable, they were not so overt, constant, and aggressive as to amount to severe or chronic abuse. Indeed, none of plaintiff's interactions with Farmer were of sufficient seriousness to prompt her to report the incidents until almost a month after they allegedly started occurring. *See, e.g.*, *Kennedy v. Nat'l R.R. Passenger Corp.*, 139 F. Supp. 3d 48, 61 (D.D.C. 2015) (cataloguing cases, and considering the promptness with which plaintiff reported the allegedly discriminatory conduct).

In sum, sexual harassment, to be actionable, must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (alterations in original accepted and citation omitted). Even with all facts and assumed inferences drawn in her favor, plaintiff cannot meet this requisite standard. Taken together, the events plaintiff describes may have been offensive and unprofessional but do not demonstrate an abusive workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21 (citation omitted).

Defendants' motion for summary judgment on plaintiff's hostile work environment claim is thus granted.[8]

### B. Retaliation

"The DCHRA prohibits an employer from retaliating against an employee who complains about discrimination in the workplace." *Holbrook v. District of Columbia*, 259 A.3d 78, 86 (D.C. 2021) (citing D.C. Code §§ 2-1402.11(a)(1)(A), 2-1402.61(a)). DCHRA retaliation claims, like those brought under Title VII, trigger the familiar *McDonnell-Douglas* burden-shifting framework. *See Bryant v. District of Columbia*, 102 A.3d 264, 267–68 (D.C. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, a plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) her employer took a materially adverse action; and (3) a causal link connects the two. *Id.* at 268. "Evidence of retaliation may be direct or circumstantial," but "[b]efore a factfinder can infer causation, there must be evidence that the employer was aware of the protected activity." *Id.*

If a plaintiff establishes her prima facie case, the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its actions. *Jones v. Bernanke*, 557 F.3d 670, 677

---

[8]  The parties dispute whether defendants had knowledge of Farmer's problematic behavior before plaintiff was fired. Relying on McMullen's deposition testimony, plaintiff contends that other employees had previously complained about Farmer's behavior. *See* Pl.'s Opp'n at 2 (citing McMullen Dep. at 34:1–36:7), 11–12. Defendants, in response, argue that the deposition testimony, read in its full context, showed that an employee had made a complaint but "chose not to provide details about it" or "pursue it further," and thus defendants did not have "knowledge of Farmer engaging in behavior that would be considered harassment." Defs.' Reply at 1–2. While the question of defendants' knowledge is a dispute of fact, this is not material because Farmer was undisputedly plaintiff's supervisor. In general, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807. The existence of respondeat superior in the context of harassment by a supervisor, however, is an affirmative defense for which the employer has the burden of proof—not, as framed here, part of plaintiff's case. *See Jones v. Dep't of Corr.*, 429 F.3d 276, 279 (D.C. Cir. 2005). In contrast, "[a]n employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and corrective action." *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).

(D.C. Cir. 2009) (citation omitted). If the employer does so, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Id.* (alteration in original accepted and citation omitted). At this final stage, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 678 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *see also Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (explaining that plaintiff survives summary judgment "by providing enough evidence for a reasonable jury to find that the employer's proffered explanation was a pretext for retaliation or discrimination").

Defendants do not argue that plaintiff failed to establish a prima facie case of retaliation. Rather, they contend that a legitimate nondiscriminatory reason for plaintiff's termination existed: "[t]he contract for the Blackbird Apartments, where [plaintiff] had been working, was terminated, and she was laid off as a result." Defs.' Mem. at 8. The "central question" is thus whether plaintiff has produced sufficient evidence for a reasonable jury to find that defendant's asserted non-discriminatory reason was not the actual reason for terminating plaintiff's employment. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013). Whereas defendants have met their burden of producing a legitimate nondiscriminatory reason, plaintiff has not met her subsequent burden of persuading that the reason was pretext for discrimination.

Rather than bolstering her affirmative case, plaintiff attempts "indirectly . . . [to] show[] that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). Specifically, she argues that "McMullen testified that the 'contract did not end' and Cunningham was not terminated for this reason." Pl.'s Opp'n at 13 (emphasis omitted). Plaintiff, however, oversimplifies the record. McMullen first testified that he "do[es] not recall with specificity" why plaintiff was terminated but "believe[d] there was an allegation from a manager that she was sleeping on post," McMullen Dep. at 24:12–14, but he later "correct[ed] [his] previous answer and state[d] that, yes, Ms. Cunningham was, in fact, laid-off when we lost the contract in Southwest DC," *id.* at 48:4–7. He then explained his confusion: "To the best of my knowledge and recollection, this is how I got confused earlier. There was an allegation that Ms. Cunningham was found asleep at the post in the back loading dock that was witnessed by a property manager, which led to the contract's termination." *Id.* at 55:8–13; *see also id.* at 56:4–5 ("To the best of my knowledge and recollection, the contract did end.").

To be clear, the conclusion that defendants have met their burden of production does not turn on any credibility determination for McMullen, which is outside the Court's prerogative. Rather, it turns on the employer's low burden at this stage of the *McDonnell-Douglas* framework, which is one of production, not persuasion. *See Burdine*, 450 U.S. at 257–58 (explaining that "limiting the defendant's evidentiary obligation to a burden of production," *i.e.*, an obligation only to "*articulate*—not prove—a legitimate, nondiscriminatory reason," will not "unduly hinder the plaintiff").

McMullen's deposition is further supported by the following interrogatory response:

Question: Describe in detail each legitimate non-discriminatory reason for why Plaintiff was terminated by Defendant.

16

>Answer: Defendant's supervisor at the time advised us that Plaintiff was laid off due to contract ending. She was hired for a contract and when that contract ended, her job also ended."

Shasthra Interrogs. & Producs. at 2; *see also* Fed. R. Civ P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."); *Dews-Miller v. Clinton*, 707 F. Supp. 2d 28, 54 (D.D.C. 2010) (explaining that affidavits from supervisors "attesting to the proffered legitimate, nondiscriminatory reasons" is sufficient to shift the burden back to plaintiff); *Budik v. Howard Univ. Hosp.*, No. 12-cv-1191, 2014 WL 12942710, at *2 (D.D.C. July 17, 2014) (similar).  Defendants' justification is also supported by an email from McMullen to senior executives at Ramjay stating: "Cunningham was laid off when we lost blackbird, and not re-employed." Defs.' Mem., Ex. 5, ECF No. 28-5.  Although plaintiff concedes, in her deposition, that she "did hear" that the Blackbird Apartments contract was lost, Cunningham Dep. at 79:5–6, she speculates, in opposition, that "McMullen created the termination reason for this lawsuit," Pl.'s Opp'n at 13.  Whether plaintiff is correct that the loss of the Blackbird Apartments contract was not the real reason for her termination and that the timing of both events was merely coincidence, an employer "need not persuade the court that it was actually motivated by the proffered reason"; "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254.  Whereas defendants' evidence does just that, plaintiff makes no real attempt and thus fails to satisfy her subsequent burden of demonstrating that defendants' proffered reason is pretext of discrimination.

Accordingly, defendants' motion for summary judgment on the retaliation claim is granted.

## IV. CONCLUSION

For the foregoing reasons, even with all facts and assumed inferences drawn in her favor, plaintiff can neither show that Farmer's conduct, though unprofessional, was sufficiently severe or pervasive to alter the terms, conditions, or privileges of her employment, nor satisfy her burden, at the third step of the *McDonnell-Douglas* framework, to illustrate that defendants' legitimate, nondiscriminatory reason for terminating plaintiff—the loss of their contract with the Blackbird Apartments, where plaintiff was staffed—was pretext for discrimination. Accordingly, defendants' Motion for Summary Judgment, ECF No. 27, is GRANTED.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: December 20, 2023

_____
**BERYL A. HOWELL**
United States District Judge